**HAZARDOUS WASTE TREATMENT COUNCIL, Petitioner,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., Respondents,**

**Edison Electrical Institute, et al., Intervenors [HWTC II].**

**No. 86–1143.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 7, 1988.

Decided Oct. 7, 1988.

As Amended Oct. 7, 1988.

Rehearing and Rehearing En Banc Denied Dec. 20, 1988.

David R. Case, for petitioner. Ridgway M. Hall, Jr., Washington, D.C., also entered an appearance for petitioner.

Steven E. Silverman, Atty., E.P.A., with whom Roger J. Marzulla, Acting Asst. Atty. Gen., Brian V. Faller and Scott A. Schachter, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

William R. Weissman, with whom Toni K. Allen, Washington, D.C., was on the brief, for intervenors Edison Elec. Institute, et al. Sue M. Briggum and Douglas H. Green, Washington, D.C., also entered appearances for intervenors.

Before BUCKLEY and WILLIAMS, Circuit Judges, and EDWARD D. RE,* Chief Judge, U.S. Court of International Trade.

Opinion PER CURIAM.**

PER CURIAM:

The Hazardous Waste Treatment Council petitions for review of the Environmental Protection Agency's rules concerning burning of hazardous wastes, including used oil, as fuel. Petitioner attacks the rules because they (1) fail to regulate generators, transporters, and others who deal with used oil, (2) insufficiently regulate used oil that exhibits the characteristics of a hazardous waste, (3) regulate under the used oil (rather than the hazardous waste) rules those who generate a small quantity of hazardous waste and mix it with used oil, (4) permit circumvention of the rules by the dilution of used oil with virgin oil, and (5) fail to regulate certain combustion residuals resulting from the burning of hazardous waste fuels. We conclude that petitioner has representational standing to raise all but the last challenge. On the merits, we uphold the regulations petitioner had standing to challenge as reasonable constructions of the statute.

## I. BACKGROUND

### A. Statutory and Regulatory Background

The statutory and regulatory treatment of hazardous wastes in general and used oil

in particular is described more fully in a companion case, *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270 ("*HWTC I*"), issued today. Subtitle C of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6921–6939a (1982 & Supp. III 1985), establishes a comprehensive scheme to regulate hazardous wastes. This scheme applies when the Environmental Protection Agency ("EPA" or "Agency") identifies ("lists") a substance as a hazardous waste, or when a substance exhibits one of the technical characteristics of hazardousness developed by the EPA. *See id.* at § 6921(b); 40 C.F. R. §§ 261.10–.11 (1987) (criteria for listing); *id.* at §§ 261.20–.24 (characteristics of hazardous wastes).

Congress supplemented the RCRA by requiring the EPA to promulgate standards for hazardous waste burned as fuel, whether the hazardous waste is burned alone or in combination with another substance. 42 U.S.C. § 6924(q)(1) (Supp. III 1985).

Congress also directed the EPA to deal with used oil. Section 7 of the Used Oil Recycling Act of 1980 ("UORA"), Pub.L. No. 96–463, 94 Stat. 2055 (codified as amended at 42 U.S.C. § 6935(a) (Supp. III 1985)), authorizes the Agency to regulate recycled oil, whether or not it classifies such oil as hazardous under subtitle C of the RCRA. (Recycled oil includes used oil that is burned, the subject of the challenged regulations. 49 U.S.C. § 6903(37) (1982).) In 1984, Congress directed the EPA to determine whether to list used oils as hazardous wastes. 42 U.S.C. § 6935(b) (Supp. III 1985). If it listed any, the Agency was to promulgate special regulations for the generators, transporters, and recyclers of used oil. *Id.* at §§ 6935(c) & (d). In *HWTC I*, we overturned the EPA's decision not to list any recycled oils as hazardous under section 6935(b).

Finally, 42 U.S.C. § 6921(d)(4) (Supp. III 1985) permits the EPA to exercise its discretion whether to regulate those who gen-

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1982).

** Judge Williams authored Part II.A. dealing with standing. Judge Buckley authored the balance of the opinion.

erate 100 kilograms or less of hazardous waste per month.

## B. Agency Action

The final rule that petitioner challenges, 50 Fed.Reg. 49,164 (1985) (codified at 40 C.F.R. pts. 261, 264–66, 271) establishes two general categories for used oil that is burned for energy recovery. The first category is *hazardous* oil, which is defined as used oil deliberately mixed with hazardous waste. Hazardous oil is regulated in the same manner as any other hazardous waste fuel. 50 Fed.Reg. at 49,175–78; *see* 40 C.F.R. pt. 266, subpart D (1987) (hazardous waste fuel regulations). Used oil that contains 1,000 parts per million ("ppm") of total halogens is presumed to be hazardous oil. The presumption can be rebutted by the holder of the oil. 40 C.F.R. § 266.40(c). All other used oil is classified simply as *used* oil, even if it has acquired the characteristics of hazardous waste in the course of its normal use. *Id.* at § 266.40(d). (We shall refer to this category as "regulated used oil.")

The Agency has promulgated a variety of specifications for regulated used oil relating to characteristics such as ignitibility and the concentration of certain contaminants. *Id.* at § 266.40(e). "Specification" oil (oil that meets the specifications) is subject only to analysis and recordkeeping requirements. *Id.* & § 266.43(b). "Off-specification" oil may be burned only in certain types of industrial boilers, *id.* at § 266.41; marketers and industrial burners must comply with certain administrative requirements, *id.* at §§ 266.43–.44. The EPA permits off-specification oil to be mixed with previously unused ("virgin") oil so as to dilute the contaminant concentration and thus meet the specifications. 50 Fed.Reg. at 49,187–88.

The rules also deal with so-called small quantity generators, i.e., those which produce 100 kilograms or less of hazardous waste per month. The Agency has determined that such wastes ordinarily will not be regulated, 51 Fed.Reg. 10,146, 10,153 (1986) (codified as amended at 40 C.F.R. § 261.5 (1988)), and that determination has not been challenged. When these wastes are combined with used oil, however, the mixture is treated only as regulated used oil. As such, it is not subject to the more stringent regulations applicable to other hazardous waste fuels.

Finally, the Agency concluded that under the Bevill Amendment, 42 U.S.C. § 6921(b)(3), residues from burning hazardous waste fuels in mining furnaces and cement kilns would be exempt from regulation, as would residues from coal-burning utility boilers in which hazardous waste was fifty percent or less of their fuels.

## II. Standing and Jurisdiction

### A. Standing

▮ The Hazardous Waste Treatment Council is a national trade organization of firms engaged in the treatment of hazardous waste and the manufacture of equipment for that purpose. The gist of its complaint here is that EPA's regulations are not comprehensive and strict enough to comply fully with the controlling statute, RCRA. Concerned with the apparent anomaly of regulated entities demanding stricter regulation, we requested the parties to brief the issue of standing. Besides its brief, the Council has submitted the affidavits of its executive director and also of executives of five member companies.

We conclude that the Council has standing insofar as it represents members on whom regulatory laxity may inflict environmental injury; we reject standing for it as representative of firms that may suffer competitive loss because EPA has not forced on their competitors as demanding (and expensive) techniques as they themselves employ.

#### 1. *Allegations as to Standing.*

The Council's member firms operate facilities in 48 states. They provide treatment or disposal services employing both established and emerging technologies and methods for treatment and management: incineration and other thermal destruction, reclamation, biological and chemical treatment, land disposal after pre-treatment,

and hazardous site cleanups. A number of member companies are engaged in the reclamation of used oil, the blending of used oil for use as industrial fuel, and the treatment and disposal of used oil.

The Council's Articles of Incorporation declare that among its purposes is

> To promote the protection of the environment through the adoption of environmentally sound procedures and methods of destroying and treating hazardous wastes and the proper management of residues of those treatment and destruction processes.

The affidavits submitted by the Council and various members reveal the members' varied relations to the substantive issues raised in this case. We can identify three different types:

a. *Competitor claims.* At least three members claim that the asserted laxity of the regulations will diminish the market for their high-tech control services. (CF Systems Corporation, Swatz Affidavit; SYSTECH Corporation, Eifert Affidavit; Ross Environmental Services, Stiff Affidavit.) Firms with contaminated used oil on hand will, they argue, be free to re-use that oil without either using the treatment services of Council members or incurring the expense of themselves providing the high-quality treatment that Council members offer. (Alternatively, such firms may sell the contaminated used oil to others for their use, again without either using the services of these Council members or incurring comparable costs.) As a result, the market for the services of these members of the Council will be smaller than it would have been if the EPA had adopted the Council's views. The affidavit of the Council's executive director, Richard C. Fortuna, refers solely to this injury.

Ross and yet another company (ThermalKEM) assert a variation on this claim. The variation requires special mention because it is the sole injury that the affidavits appear to link to the Council's "Bevill Amendment" claims (contentions that the EPA has given too broad a construction to the exemptions provided by that Amendment). These companies incur substantial costs for the disposal of ash from their own incineration facilities, costs evidently mandated by existing regulation. As a result of EPA's broad definition of the Bevill Amendment, certain utilities and smelters —"Bevillized facilities," as they put it—will be free to generate ash without incurring comparable costs. Thus the EPA's ruling evidently deprives Ross and ThermalKEM of a potential market. Moreover, to the extent these member firms compete with Bevillized facilities as sellers of items produced with hazardous wastes, the EPA ruling tends to enable the Bevillized competitors to undersell them.

b. *Consumer claims.* BVER Environmental asserts that it is in the business of receiving non-hazardous used oil from heavy manufacturing industries for processing and resale as boiler fuel. It claims that its receiving facilities are injured when it receives adulterated or contaminated used oils, and that it is expensive to test every tankload. Receipt of a single 5,000–gallon contaminated tankload may cause it to lose as much as $100,000. More stringent EPA regulations would tend to protect it from this sort of injury. (Policow Affidavit.)

c. *Claims of supply diminution.* Affidavits filed by several members assert that the alleged regulatory laxity will cause their *supply* of contaminated used fuels to be diverted elsewhere. (SYSTECH Corporation, Eifert Affidavit; Ross Environmental Services, Stiff Affidavit; ThermalKEM Inc., Zeigler Affidavit.) These affidavits make no effort to explain how regulatory laxity reduces supply in any normal sense of the word. So far as we are able to discern, these claims must fit into one of the two categories discussed above. Either the firms suffer because there is less demand for their services or because the oils they receive are less pure. Accordingly, we drop these allegations from any separate consideration here.

2. *Application of Standing Principles.*

It is a commonplace that standing encompasses two components: constitutional and prudential. For constitutional standing, a

plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed. by the requested relief. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). For prudential standing, a plaintiff usually must show, in addition, that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute ... in question," *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Under the zone of interests test, the "essential inquiry is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law.'" *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). (An alternative basis for prudential standing, resting on non-statutory interests, is also considered below.) The problem here lies with prudential standing.

a. *The consumer claims.* We have no difficulty finding that the consumer interests represented by the Council are entitled to standing. According to the affidavit of the affected member company's executive, it suffers direct losses as a recipient of contaminated used oils. That the injury is commercial is no obstacle. "[S]neering at [commercial] gains by adding 'mere' to them does not make them go away." *United States Department of the Air Force v. FLRA,* 838 F.2d 229, 233 (7th Cir.1988). Owners of a lake who licensed its use by fishermen and boaters would surely have standing to attack regulatory laxity that led to increased water pollution; there appears no principle by which one could reasonably distinguish the injury alleged here.

We will address below the problem of whether the *Council* is an appropriate representative of the consumer interests of BVER.

b. *The competitor claims.* The Council's competitor claims appear quite similar to those asserted in *Calumet Industries, Inc. v. Brock,* 807 F.2d 225 (D.C.Cir.1986). There the petitioners objected to the Occupational Safety and Health Administration's decision to adopt a narrow definition of the class of oils that vendors were required to label as health hazards. Petitioners' oils indisputably required such labelling. We found that "the interest to be protected by the OSH Act is worker safety ... and *not* business profits" and consequently held that "[a]s petitioners here [did] not come before us as protectors of worker safety, but instead as entrepreneurs seeking to protect their competitive interests, we think it plain they lack standing." *Id.* at 228 (emphasis in original).

Here, however, the Council asserts that its interests, though pecuniary, are in sync with those sought to be served by RCRA. In essence they suggest that tightening of environmental standards will generally foster not only a cleaner environment but also the member companies' profits, as it will expand the market for their services.[1]

The Supreme Court's decision in *Clarke* leaves the status of this sort of incidental benefit somewhat unclear. *Clarke* explained that the zone of interests "test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff. *Investment Company Institute* [*v. Camp*], *supra* [401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971)]." 107

---

1. As its executive director notes, the Council is unique in that it represents firms whose economic interests and future viability depend on the presence, not the absence, of appropriate regulations for the protection of the environment which create the demand for their advanced waste treatment and management services.... Thus the linkage between effective implementation and enforcement by

EPA of regulatory programs under RCRA, increased protection of human health and the environment, and increased use of the waste treatment services provided by the HWTC member companies is a direct one. HWTC exists to represent the collective interest of its member companies in proper environmental control.
Fortuna Affidavit at 2–3.

S.Ct. at 757 (footnotes omitted).[2] On the other hand, it said the test "denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* We must thus find operational meaning for a test that demands less than a showing of congressional intent to benefit but more than a "marginal[ ] rela[tionship]" to the statutory purposes.

The answer may lie in presumptions revolving around the congressional intent to benefit. Where that intent is plain, we may entertain a presumption of standing—a presumption that can be overcome by, for example, a finding that suit by intended beneficiaries would "severely disrupt [a] complex and delicate administrative scheme." *Block v. Community Nutrition Institute*, 467 U.S. 340, 348, 104 S.Ct. 2450, 2455, 81 L.Ed.2d 270 (1984), quoted in *Clarke*, 107 S.Ct. at 757. In the absence of apparent congressional intent to benefit, however, there may still be standing if some factor—some indicator that the plaintiff is a peculiarly suitable challenger of administrative neglect—supports an inference that Congress would have intended eligibility. *Cf. Haitian Refugee Center v. Gracey*, 809 F.2d 794, 812–13 (D.C.Cir.1987) (pre-*Clarke* case stating that the initial inquiry is whether "from the face of the statute" the interest was arguably intended to be protected or regulated, but that clear evidence in the legislative history of intent to afford or deny standing may rebut the initial answer).

Here the Council points essentially to Congress's indisputable intent to encourage proper disposal and recycling of hazardous wastes. See, e.g., 42 U.S.C. §§ 6901(a)(4), 6902(a)(6). But that intent, of course, shows neither that Congress intended to benefit recycling and disposal

firms nor that such firms' interests are more than "marginally related" to Congress's environmental purposes. Whenever Congress pursues some goal, it is inevitable that firms capable of advancing that goal may benefit. If Congress authorized bank regulators to mandate physical security measures for banks, for example, a shoal of security services firms might enjoy a profit potential—detective and guard agencies, manufacturers of safes, detection devices and small arms, experts on entrance control, etc. But in the absence of either some explicit evidence of an intent to benefit such firms, or some reason to believe that such firms would be unusually suitable champions of Congress's ultimate goals, no one would suppose them to have standing to attack regulatory laxity. And of course a rule that gave any such plaintiff standing merely because it happened to be disadvantaged by a particular agency decision would destroy the requirement of prudential standing; any party with constitutional standing could sue.

It is worth remembering that judicial intervention may defeat statutory goals if it proceeds at the behest of interests that coincide only accidentally with those goals. The companion case, *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270, No. 86–1658, illustrates the risk that the interests may diverge significantly. There EPA refused to list certain types of used oil as hazardous wastes because it thought this would have the boomerang effect of increasing illegal dumping and thus would result in net harm to the environment. Although the court finds that Congress did not authorize the EPA to consider such an effect, it is a perfectly plausible one. See Martin T. Katzman, From Horse Carts to Minimills, 92 *The Public Interest* 121, 132 (Summer 1988) (discussing effect of expectation that EPA would list as hazardous waste oil from dismantled cars). When we grant standing to a party with only an

---

**2.** It further observed that our decision in *Control Data Corp. v. Baldrige*, 655 F.2d 283, 293–94 (D.C.Cir.), *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981), to the extent that it "suggests otherwise," is "inconsistent with our understanding of the zone of interest test, as now formulated." *Id.* at 757 n. 15. We followed

*Control Data* in *Glass Packaging Inst. v. Regan*, 737 F.2d 1083 (D.C.Cir.), *cert. denied*, 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 400 (1984), and *Copper & Brass Fabricators Council, Inc. v. Department of the Treasury*, 679 F.2d 951 (D.C.Cir.1982), which are presumably condemned to the same extent.

oblique relation to the statutory goal, we run the risk that the outcome could, even assuming technical fidelity to law, in fact thwart the congressional goal. Further, of course, technical fidelity to law cannot be assumed; judges err.

The risk is present here as well. A regulatory extension sought by the competitor interests in the Council might benefit recyclers' profits (e.g., by forcing the use of more advanced recycling techniques) but harm the environment (because, for example, its cost might lead to substitution of more environmentally harmful fuels).

In the absence of any suggestion either of congressional intent to improve the competitive position of high tech recyclers, or of any reason to picture such firms as suitable challengers of the agency, we believe those interests to be outside the critical zone.

Of course there are many cases allowing standing to firms whose sole concern is exposure to unwanted competition. For example, the Supreme Court has in a series of cases found standing for competitors claiming to be adversely affected by the Comptroller of the Currency's permissive interpretations of the statutes restricting the activities of national banks. See *Clarke*, 107 S.Ct. 750; *Investment Company Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). And, in accordance with *Clarke*'s abjuration of any requirement of congressional intent to benefit, these have not rested on any showing of explicit intent to shelter plaintiffs or their like from the hazards of competition. See, e.g., *Investment Company Institute*, 401 U.S. at 629–34, 91 S.Ct. at 1098–1100 (reviewing goals of Glass–Steagall Act).

The Court may have inferred congressional approval of such challengers on the view that those whom Congress explicitly sought to benefit would make relatively unsuitable plaintiffs. For example, it is hard to picture a person or firm that could assert injury in the form of "the dangers of possible loss of public confidence in banks and the danger to the economy as a whole of speculation fueled by bank loans for investment purposes," 107 S.Ct. at 756–57 n. 13 (summarizing *Investment Company Institute*'s analysis), said to have been a key evil that the Glass–Steagall Act sought to avert. By contrast, of course, competitors suffer sharp, clear losses when banks invade forbidden territory. To some extent, moreover, the Court may tend simply to assume, without evidence, that entry-restricting legislation is intended to shelter competitors, as legislators might be peculiarly reluctant to articulate a goal of sheltering competitors, no matter how influential it may be. *Cf. Panhandle Producers v. Economic Regulatory Admin.*, 822 F.2d 1105, 1109 (D.C.Cir.1987) (attributing the success of competitors in securing standing to enforce entry-restricting licensing statutes to a substantial congruence between such firms' interests and "a statutory purpose to restrict entry," evidenced in part by such statutes' typical origin in the competitor firms' political efforts).

The Council here seeks to bring itself under these cases by identifying RCRA as an "entry-restricting" statute—aimed at excluding from the market providers of less excellent treatment services. But any pecuniary beneficiary of a regulatory program could so characterize it; to accept the characterization as a basis for standing would eliminate the prudential standing requirement. As the consumers of the environmental purity afforded by RCRA seem highly suitable champions of enforcement, and we find no clue of congressional intent to rely on other champions, we find the entry-restriction cases inapplicable.

Nor does the fact that RCRA exposes some of the activities of petitioner's members to regulation afford the Council prudential standing. A party is "regulated" for purposes of the "zone" test only if it is regulated by the particular regulatory action being challenged. In *Calumet Industries, Inc. v. Brock*, 807 F.2d 225 (D.C.Cir. 1986), where petitioners were clearly subject to the enabling act itself, we found that they lacked standing because they were "not directly regulated by the rulings

being challenged in this case. Rather, a more appropriate description is that [they] operate[ ] in an industry which is regulated by the rulings but do[ ] not operate in that sphere of the industry which is the object of the regulation." 807 F.2d at 229 (quoting *Tax Analysts and Advocates v. Blumenthal*, 566 F.2d 130, 143 n. 82 (D.C.Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978)).

It is possible that some of the regulations adopted here apply to some members of petitioner. But in view of the nature of petitioner's claim, that does not render *Calumet* any less relevant. Petitioner wants to increase the regulatory burden on others. Its interest lies in the competitive advantage that its members might secure if the government imposed higher costs on other firms. As noted above, that interest carries a considerable potential for judicial intervention that would distort the regulatory process. As in the prior analysis, we see no special reason to suppose that Congress might have thought them suitable advocates of the environmental interests underlying the statute.

Finally, we must consider a line of cases finding prudential standing for those who sell to regulated parties and complain that a regulatory *restriction* will curtail its opportunities to sell to those parties. See, e.g., *National Cottonseed Products Ass'n v. Brock*, 825 F.2d 482 (D.C.Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988); *FAIC Securities, Inc. v. United States*, 768 F.2d 352 (D.C.Cir. 1985). In *FAIC Securities* then-Judge (now Justice) Scalia endeavored to reconcile the cases seeming to revolve around such a principle. His discussion focused primarily on some conflicting clues among the precedents, but in a footnote he suggested an underlying logic to the cases: the value of judicial protection for the non-statutory rights of such parties to deal freely with the regulated firms:

> We salute in passing Professor Monaghan's recent admirable effort to bring coherence to the vendor-vendee cases by analyzing them as properly first-party standing cases, seeking to vindicate a "freedom to interact with a third person." Monaghan, *Third Party Standing*, 84 Colum.L.Rev. 277, 299 (1984). If we understand his analysis correctly, it would lead to a conclusion of standing here. "[I]t seems plain that either party to a regulated transaction can challenge any limitation in first party terms, because for each party the claim takes the following form: the state has advanced no sufficient interest to justify prohibiting this interaction." *Id.* at 303 (footnote omitted).

768 F.2d at 360 n. 5. See also *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 422–23, 62 S.Ct. 1194, 1202–03, 86 L.Ed. 1563 (1942) (broadcasters have standing to challenge regulations that interfere with ability to contract with radio station owners whose licenses would be jeopardized by continuing relations with broadcasters); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 199–200, 76 S.Ct. 763, 768–69, 100 L.Ed. 1080 (1956) (same); *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

The Council plainly lacks any such non-statutory interests. A firm has no common law interest, much less a constitutional one, in having government drive business its way or in having government force competitors' services to be of the same quality (and cost!) as its own.

c. *The Council as representative of BVER's consumer interest.* Having concluded that the consumer interest of BVER (and any other member companies similarly situated) is sufficient for standing, but that the competitor interests of member companies are not, we must consider whether the Council has standing as a representative of the former. As *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), frames the issue, it is whether "the interests [the association] seeks to protect are germane to the organization's purpose."

The Council's Articles of Incorporation say that it aims (among other things) to "promote the protection of the environment

through the adoption of environmentally sound practices and methods of destroying and treating hazardous wastes." We have no doubt of its bona fides; one may fervently hope to do good even if he expects to do well in the process. Further, while the fit between Congress's environmental goals and the Council members' competitive ones is not tight enough for the latter to afford the Council standing, the germaneness test is relatively loose. As recently construed by this court, it requires "mere pertinence between litigation subject and organizational purpose." *Humane Society of the United States v. Hodel,* 840 F.2d 45, 58 (D.C.Cir.1988).[3] While the Council's stated devotion to the environment does not excuse it from having to show a specific injury to the members' environmental interests, it does suggest that BVER's interest is germane to the Council's purposes.

There remains this problem: HWTC's *primary* interests have a quite different focus from BVER's interest in *consuming* relatively clean used oil. In Fortuna's affidavit, for example, there is not a single reference to HWTC members' interests as consumers; the entire focus is on their interest in having EPA create a market for their services—with higher technology and at higher cost. Does the potential split between these and the Council members' interest as environmental consumers render the latter non-"germane" under *Hunt* ?

Under this court's application of its "pertinence" test in *Humane Society of the United States v. Hodel,* 840 F.2d 45 (D.C. Cir.1988), the potential split appears no bar. The court had identified as sufficient for standing the Humane Society's members' aesthetic interests in seeing animals and birds on wildlife refuges, and in not seeing animal corpses and environmental degradation. The Society's articles of incorporation spoke exclusively of the protection of all living things "(presumably for their

own intrinsic worth)," *id.* at 53, but nothing of the human interest in seeing these living things. The court found the relationship sufficient under its "pertinence" test. *Id.* at 59–60.

The interests found within the "zone" in *Humane Society* are ones that normally, but not invariably, would be seen as part of the broader goal to which the Society was explicitly committed. But one can imagine conflicts: optimal life for a species might require seclusion from human viewers. Indeed the court recognized the potential conflict, but read prior cases to preclude its being treated as an obstacle to the Society's standing. *Id.* at 59–60 n. 25. There is clearly some tension between this relaxed rule and the prudential insistence that the parties have interests within the statutory goals: if suits by parties with interests outside or at odds with those goals may lead a court to interventions that fail to advance those goals, then so may suits by internally conflicted organizations. But perhaps the duty of the association's directors to represent all elements fairly is thought to mitigate the risk. In any event, under *Humane Society* the Council appears to be an adequate representative of the BVER environmental consumer interest.

d. *The Council's standing in its organizational capacity.* The Council argues that EPA's alleged illegalities impinge upon a number of its organizational interests: they "damage the public trust in, and acceptability of, responsible treatment businesses and technologies"; by defeating its efforts to bring about proper management of used oils, EPA's illegalities diminish the Council's "ability to attract new members and retain existing members"; they diminish its ability "to refer potential customers who need treatment services ... to member companies"; and, as the challenged decisions exempt certain generators, collectors and blenders from reporting require-

---

3. See also *Hotel & Restaurant Employees Union, Local 25 v. Smith,* 846 F.2d 1499, 1502–04 (D.C. Cir.1988) (*en banc* ) (separate opinion of Judge Mikva); but see *Hotel & Restaurant Employees Union, Local 25 v. Attorney General,* 804 F.2d 1256, 1276 (D.C.Cir.1986) (separate opinion of

Judge Silberman) (suggesting that the rights vindicated must be "the sort of rights that by their *nature* relate to a particular organization"), *vacated and aff'd en banc by equally divided court* in the decision cited immediately above.

ments, the illegalities thwart the Council's "ability to obtain information necessary for its educational and promotional activities." HWTC's Supplemental Brief Regarding Prudential Standing at 13–14.

Assuming *arguendo* that these injuries satisfy the constitutional component of standing, all one need say here is that the Council has made no effort whatever to link them to the statutory purposes. Of course RCRA seeks to improve the environment, and, as we have noted, promotion of environmental quality is among the goals of the Council. In the Council's view, this general coincidence of goals should suffice to bring the Council's organizational interests within prudential standing requirements: any decision that disadvantages the Council thwarts RCRA. But plainly this is not enough. If it were, persons with only a "generalized grievance[ ]," concededly insufficient for standing, see *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed. 2d 706 (1974), could simply form an organization to advance their grievance, and, whenever an agency decision offended their position, secure standing by asserting that it had thrown practical roadblocks in the way of the organization's success. See *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 813–14 (D.C.Cir.1987) (citing cases).

We find that the Council has standing as the representative of BVER's consumer environmental interests. These interests do not encompass the Council's Bevill Amendment contentions, which accordingly we do not reach.

B. Jurisdiction

■ Our appellate jurisdiction is premised on 42 U.S.C. § 6976(a)(1) (1982), which authorizes review under the Administrative Procedure Act, 5 U.S.C. §§ 701–06 (1982), of "final regulations" and the "denial of any petition for the promulgation ... of any regulation...." We recently interpreted this provision in *United Technologies Corp. v. EPA*, 821 F.2d 714, 721 (D.C. Cir.1987). The Environmental Defense Fund ("EDF") challenged an EPA rule reg-

ulating certain waste management units because it failed to implement the statutory directive to regulate more comprehensively. EDF did not challenge the regulations actually promulgated but argued that the Agency should have promulgated a different rule. We dismissed the petition for lack of jurisdiction because it was not a challenge to the promulgation or denial of a petition to promulgate any rule. Had EDF petitioned the Agency to promulgate the rule under 42 U.S.C. § 6974 (1982), it could have sought review if the petition had been denied.

*United Technologies* disposes of petitioner's challenge to the scope of the rules. Petitioner claims the rules do not go far enough because they fail to regulate generators and transporters of used oil, as well as facilities that store and blend used oil. Like EDF, petitioner argues that the Agency should have promulgated rules that it has not promulgated.

Petitioner seeks to escape the force of *United Technologies* by characterizing its argument as a challenge to the regulations as promulgated. But an agency's failure to regulate more comprehensively is not ordinarily a basis for concluding that the regulations already promulgated are invalid. "The Agency might properly take one step at a time." *United States Brewers Ass'n v. EPA*, 600 F.2d 974, 982 (D.C.Cir. 1979). Unless the agency's first step takes it down a path that forecloses more comprehensive regulation, the first step is not assailable merely because the agency failed to take a second. The steps may be too plodding, but that raises an entirely different issue over which the district courts might have exclusive original jurisdiction. 42 U.S.C. § 6972(a) (1982 & Supp. III 1985); *Sierra Club v. Thomas*, 828 F.2d 783, 787–92 (D.C.Cir.1987). Petitioner does not claim such a delay.

Petitioner's basic argument is that the promulgated regulations "fail to include necessary requirements" of the statute—not because the EPA ignored a factor that the statute requires it to consider, but only because it has not fully implemented the

statutory goal. We lack jurisdiction over that claim.

### III. STANDARD OF REVIEW

In reviewing an agency's construction of its governing statute, we first ask whether Congress has spoken to the precise question at issue. *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If so, we must enforce that unambiguously expressed intent. *Id.* at 842–43, 104 S.Ct. at 2781–82. Congress' intent is determined in the first instance by examining the "particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, — U.S. ——, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). If the language and structure of the statute express a clear intent, we ordinarily will not examine the legislative history. "Unless exceptional circumstances dictate otherwise, '[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete.'" *Burlington N. R.R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) (citation omitted). If Congress did not have a specific intent, we ask whether the agency's construction of the statute is "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers Union, Local 23*, — U.S. ——, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987). Even if the legislative history is insufficient to establish a clear intent under *Chevron*'s first step, it may be relevant in determining the permissibility of the agency's construction. *See, e.g., Securities Industry Ass'n v. Board of Governors*, 847 F.2d 890, 896 (D.C.Cir.1988).

### IV. MERITS

A. Used Oil with the Characteristics of Hazardous Waste

As explained above at 280, the EPA's less stringent used oil regulations apply to used oil contaminated solely through ordinary use, even though it exhibits the characteristics of hazardous waste. Petitioner argues that this violates 42 U.S. C. § 6924(q) (Supp. III 1985), which it interprets as requiring the EPA to treat all fuel that exhibits the characteristics of a hazardous waste under the hazardous waste fuel regulations.

The statute requires the EPA to promulgate such standards for hazardous waste fuel "as may be necessary to protect human health and the environment." 42 U.S. C. § 6924(q). But it grants considerable discretion to the Agency in formulating these standards: "Such standards *may* include any of the requirements set forth in [§ 6924(a) ] *as may be appropriate.*" *Id.* (emphasis added). (Section 6924(a) lists various requirements (e.g., record-keeping, monitoring, treatment practices) to be imposed by regulation by the EPA on hazardous waste treatment, storage, and disposal facilities.)

The Agency complied with its statutory obligation by promulgating standards for all used oil that exhibits the characteristics of hazardous waste and is burned as fuel: Hazardous used oil is regulated strictly, off-specification used oil is regulated less strictly, and specification used oil is regulated only slightly. This regulatory scheme reflects the EPA's expert judgment concerning the amount of regulation necessary to protect human health and the environment from the adverse effects of various types of used oil. The record amply supports this judgment, and petitioner does not seriously challenge the factual basis for the Agency's classifications.

The language of section 6924(q) permits the Agency to impose only such of the requirements of section 6924(a) "as may be appropriate." The structure of the statute confirms the EPA's broad discretion to impose less stringent requirements on used oil fuel. The EPA is authorized by 42 U.S.C. § 6935(a) to regulate recycled oil (including oil that is burned). Such regulations are not to "discourage the recovery or recycling of used oil, consistent with the protection of human health and the environment." *Id.; see also id.* at §§ 6935(c) & (d). These provisions contemplate EPA rules for regulated used oil fuel that may

be less stringent than rules applicable to other hazardous wastes.

Petitioner further suggests that the regulations irrationally distinguish between used oil displaying hazardous characteristics based on how the oil obtained those characteristics. The Agency provided a reasoned basis for this distinction. When oil acquires the characteristics of hazardous waste through normal use, overly stringent regulations may discourage burning. This might encourage improper disposal of used oil, thereby increasing environmental harm while decreasing energy conservation. On the other hand, the EPA thought used oil that is deliberately mixed with hazardous waste should be regulated as stringently as other hazardous waste fuel. Less stringent regulation would encourage such mixing to avoid the hazardous waste fuel regulations, resulting in greater environmental danger.

In *HWTC I,* we reversed the EPA's decision not to list recycled oil as a hazardous waste. If the Agency decides that the technical criteria for listing are met, it will then be required to determine what standards to promulgate under 42 U.S.C. §§ 6935(c) & (d), which will require the EPA to review the appropriateness of its rules concerning regulated used oil.

### B. Small Quantity Generators

■ When used oil is mixed with hazardous waste, it is ordinarily treated as hazardous used oil. But when the hazardous waste is produced by a small quantity generator, the rules treat the mixture only as regulated used oil. Petitioner argues that this amounts to an exemption of such mixtures from regulation in violation of section 6924(q). We disagree.

First, as we have just explained, the Agency's rules concerning regulated used oil adequately carry out its responsibilities under section 6924(q). The Agency reasonably concluded that the burdens on small quantity generators resulting from the hazardous fuel regulations outweighed their benefits. Applying the less stringent rules concerning regulated used oil adequately fulfills its statutory mandate.

Second, acting under 42 U.S.C. § 6921(d)(4), the Agency already exempted small quantity generators from hazardous waste regulations. If small quantity generators mix their hazardous waste with used oil, however, they are subject to the standards applicable to regulated used oil. Admittedly, these regulations are less stringent than the hazardous oil regulations, but they are more stringent than the exemption small quantity generators would enjoy if they did not mix.

Petitioner nevertheless argues that the special treatment of small quantity generators invites circumvention of the hazardous oil regulations. When used oil has been mixed with hazardous waste, there is no way to determine whether the hazardous waste came from a small quantity generator. Large quantity generators might be tempted to mix their wastes with oil and disguise the mixtures as produced by small quantity generators. The Agency thought this result unlikely given the presumption that oil with 1,000 ppm of total halogens is hazardous used oil. The burden will be on the holder of the oil to prove that the hazardous waste part of the mixture was produced by a small quantity generator. The EPA's expert judgment was reasonable.

### C. Dilution

■ As discussed above at 280, regulated used oil fuel is divided into two categories: specification (subject to minimal regulation) and off-specification. The specifications are designed to protect individuals having the greatest exposure to the oil. Most of the specifications are expressed as percentages of total volume (ppm), and the Agency will permit dilution of off-specification oil with virgin oil in order to meet the specifications. Petitioner claims that by permitting dilution, the rules will not decrease *total* emissions of these toxic constituents, in violation of the EPA's duty to protect the environment. 42 U.S.C. § 6935(a).

The EPA's decision was permissible. First, Congress has not spoken directly to the precise question at issue. *See Chev-*

*ron,* 467 U.S. at 842, 104 S.Ct. at 2781. The statute requires the EPA to regulate used oil fuels "as may be necessary to protect human health and the environment," 42 U.S.C. § 6924(q); *see also id.* at §§ 6935(a) & (c), but it does not specifically require the Agency to minimize total emissions of toxic constituents from used oil into the environment.

Petitioner nevertheless claims that Congress had a specific intent on this issue. It relies on a passage in the House Report on the Hazardous and Solid Waste Amendments of 1984. In discussing the provisions that became sections 6935(c) and (d), which require the promulgation of standards for used oil recycling facilities, the Report explains that such standards might apply to the end user. H.Rep. No. 198, pt. I, 98th Cong., 1st Sess. 67 (1983) U.S.Code Cong. & Admin.News 1984, 5576. The Report continues:

> This is not to say that these ... standards must necessarily apply to all end users of hazardous used oil or used oil-derived products. (Indeed, it is the Committee's view that standards are most appropriately applicable to the initial treater of hazardous waste used oil since, if contaminants are not removed at this point, total pollutant loadings from end use will not be reduced, even if the used oil is diluted before end use.)

*Id.* at 68, U.S.Code Cong. & Admin.News 1984, at 5627.

We do not agree that this parenthetical remark establishes congressional intent concerning the precise question at issue.

> Congress does not act, and cannot legally bind, through its intent and expectation as such, whether individually or collectively expressed, but only through the laws that it enacts. Thus, the only intent or expectation of Congress pertinent to our task is its intent regarding the meaning of statutory language or its expectation regarding the manner in which that language will be interpreted.... [I]t is absurd—indeed, lawless—to give legal effect to [legislative history] that purport[s] to relate, not to the meaning of the statute, but to the manner in which a legally unconstrained agent of the Executive will behave under it.

*Center for Auto Safety v. Peck,* 751 F.2d 1336, 1351 (D.C.Cir.1985). Thus, "courts have no authority to *enforce* principles gleaned solely from legislative history that has no statutory reference point." *International Bhd. of Elec. Workers, Local 474 v. NLRB,* 814 F.2d 697, 712 (D.C.Cir.1987) (emphasis original).

As the parenthetical sentence of the House Report does not interpret a provision of the statute, it is not pertinent in ascertaining legislative intent. This is not a case such as *Pierce v. Underwood,* —— U.S. ——, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), in which the statute contains a phrase ("substantially justified") that could be interpreted in two ways, and the legislative history might demonstrate that Congress meant one way rather than the other. Here, Congress gave the EPA a broad mandate—regulate as "may be necessary to protect human health and the environment." The sentence from the House Report does not even purport to interpret the extent of the Agency's authority. It suggests how the Committee thought the Agency should exercise that authority but provides no assistance in interpreting ambiguous statutory language.

The most that can be said about the parenthetical sentence is that it demonstrates that one of Congress' goals was to reduce total emissions. It does not indicate that Congress desired the EPA to reduce total emissions at all costs. As we discuss below, the Agency concluded that prohibiting dilution would decrease total emissions but would increase improper disposal of used oil, resulting in greater environmental damage overall. Did Congress intend that the Agency reduce total emissions even if this would result in increases in other types of environmental damage? Congress did not speak to this precise question.

We therefore ask whether the Agency's rule reflects a permissible construction of the statute. The EPA was confronted by conflicting objectives. It recognized that its duty to protect the environment included a responsibility to attempt to reduce

total emissions. But it also found that if it prohibited dilution, re-refiners would be unable to deal with the resulting glut of used oil. This would increase unregulated burning and dumping of used oil, magnifying the overall damage to the environment. The record supports this conclusion, and petitioner does not challenge its factual basis.

The Agency's resolution of the trade-off between conflicting goals is the essence of the discretion Congress has delegated it. When, as here, Congress has not spoken to the precise question and the agency provides "a reasonable explanation for its conclusion that the regulation serves the ... objectives [in question]," *Chevron*, 467 U.S. at 863, 104 S.Ct. at 2792, we will not overturn the agency's judgment. *Continental Air Lines v. DOT*, 843 F.2d 1444, 1450–54 (D.C.Cir.1988).

### V. CONCLUSION

That portion of the petition for review concerning the exemption promulgated pursuant to the Bevill Amendment is dismissed for lack of standing. In all other respects, the petition for review is denied.

*So ordered.*