LOUISIANA ENVIRONMENTAL AC-
TION NETWORK and Environmental
Technology Council, Inc., Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
Respondent.

American Petroleum Institute,
et al., Intervenors.

No. 98–1082.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 16, 1999.

Decided March 26, 1999.

David R. Case argued the cause for petitioners. With him on the briefs was David J. Lennett.

Mary F. Edgar, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were Lois J. Schiffer, Assistant Attorney General, and Steven Silverman, Attorney, U.S. Environmental Protection Agency.

William R. Weissman argued the cause for intervenor Edison Electric Institute, et al. With him on the brief were Steven J. Groseclose, George W. Frick, Ralph J. Colleli, David F. Zoll and Ronald A. Shipley.

Before: WILLIAMS, SENTELLE and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Opinion by Circuit Judge SENTELLE, concurring in part and dissenting in part.

STEPHEN F. WILLIAMS, Circuit Judge:

Section 3004(m) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6924(m), requires the Environmental Protection Agency to promulgate regulations governing what treatment certain kinds of hazardous waste must undergo before it may be disposed of in a landfill. EPA found that waste already in a landfill presented a special problem. The agency's authority to compel high-quality disposition of such waste is not as great as it is for as yet undisposed of waste. As a result, too-strict treatment regulations could in some circumstances discourage excavation—and thus prevent any treatment at all. Because of its concern for this, EPA promulgated a regulation under § 3004(m) allowing variances from generally applicable treatment standards if "treatment to the specified level or by the specified method is environmentally inappropriate because it would likely discour-age aggressive remediation." 62 Fed.Reg. 64,509/3 (1997). Petitioners Louisiana Environmental Action Network ("LEAN") and Environmental Technology Council ("ETC") petitioned for review of this new variance rule; we deny the petition to the extent it is ripe.

\* \* \*

Standing first. Petitioners defend only the standing of LEAN; despite its participation in oral argument and evident interest in the case, ETC (a waste treatment company trade association formerly known as the Hazardous Waste Treatment Council) appears to lack prudential standing. See, e.g., *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 925 (D.C.Cir.1989) ("*HWTC IV*") (because of concern that "judicial intervention may defeat statutory goals if it proceeds at the behest of interests that coincide only accidentally with those goals," firms selling environmental services lack standing to challenge RCRA regulations as insufficiently stringent); *Hazardous Waste Treatment Council v. EPA* ("*HWTC II*"), 861 F.2d 277, 283 (D.C.Cir.1988) (same). LEAN, by contrast, evidently an organization of environmentally concerned citizens and groups, clearly meets prudential standing requirements. It rests its claim of "injury in fact" (essential for constitutional standing) on the interests of at least three members who live near the Carlyss landfill in Louisiana. This is the site at which most waste from that state would be "land disposed" if excavated and treated. Under LEAN's theory, "lower quality" (less treated) wastes will be deposited in Carlyss; the rule in literal terms permits that effect, and holders of hazardous waste have every incentive to take advantage of it. Under EPA's theory the new rule will increase the quantity of waste disposed of at Carlyss, for it adopted the rule lest holders of hazardous waste who were free to choose would forego costly excavation and redisposal (with the likely destination, in Louisiana, of Carlyss) in favor of thrifti-

er in-place solutions. Either way, application of the variance rule will lower the average quality of waste deposited at Carlyss, and under EPA's view its application will also increase the quantity of such waste. Thus, to the extent that there is any residual risk in the lower-quality wastes, application of the rule will increase the risk of harm to LEAN members living near Carlyss.

While our partially dissenting colleague doubts that such harm is sufficiently imminent, we do not. Petitioners have noted that ·in the state of Louisiana there are over 100 inactive or abandoned hazardous waste sites for which cleanup has already been found necessary, as well as about thirty RCRA facilities designated "high priority." It is therefore all but certain that remediation activities will continue to occur apace. Even if the variance-to-remediation ratio is fairly low, the amount of such activities creates a very "substantial probability" that *some* variances will be granted, increasing risk to LEAN members near the Carlyss site. See *Florida Audubon Society v. Bentsen*, 94 F.3d 658, 666 (D.C.Cir.1996).

■ What is novel here is that LEAN must surely have (indeed, counsel at oral argument confirmed that it did have) other members who live nearer to the landfills in which waste currently resides—waste that would, absent the waiver rule's preference for excavation, treatment and redisposal, remain in place and continue to entail some risk for these LEAN members. Indeed, as the waiver rule is aimed at "cases where imposition of the otherwise applicable treatment standard could result in a *net environmental detriment* by discouraging aggressive remediation," 62 Fed. Reg. 64,505/3 (1997) (emphasis added), these other members might well be harmed *more* by continuation of the status

quo than those living near the Carlyss landfill are benefited.[1]

We have previously held that such a conflict of interest within an organization does not deprive the organization of representative standing if no internal procedural violation has been shown. *National Maritime Union v. Commander, Military Sealift Command*, 824 F.2d 1228, 1232–34 (D.C.Cir.1987). But see *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 864–65 (7th Cir.1996) (as burden to show standing is on plaintiff, plaintiff organization must demonstrate proper authorization of litigation if profound conflict of interest is present). Conceivably one might distinguish *National Maritime Union* on the ground that here we have an entity on the scene, ETC, with very real economic interests but no standing. The risk of some possible manipulation will occur even to the most naive. Nevertheless, because of the line-drawing difficulties that any such distinction would generate, we believe that in the absence of any overt signal that LEAN's decision to challenge the rule is the product of ETC's influence, *National Maritime Union* should control.

■ As LEAN's primary purpose is likely to protect the overall health of Louisiana's environment, one might question the organization's standing on germaneness grounds. See *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) ("the interests [the organization] seeks to protect [must be] germane to the organization's purpose"). But by LEAN's own description, "LEAN's purpose is to protect Louisiana's air, land, water, and other natural resources, and *to protect LEAN's members* and other citizens of the state, *from threats posed by pollution*." Petitioners' Certificate as to Parties (emphasis added). Indeed, we see no reason

1. LEAN claims that it does not oppose EPA's decision to *grant* variances on the ground that the baseline requirement is so stringent as to discourage aggressive remediation (e.g. excavation). But it does object to EPA's consideration of this excessive-stringency possibility in actually determining the *content* of a variance. Thus the outcome it seeks would likely be very similar to the status quo ante rule, i.e., standards that inhibit remediation.

to believe that LEAN's purposes are exclusively other-regarding. All non-trivial policy issues entail tradeoffs, and LEAN may legitimately object to decisions that injure its members' environmental interests, no matter what the overall calculus. That being the case, *National Maritime Union* controls this issue as well. Organizations, like people, may face the problem of "two souls in one breast," but—as long as they do not violate internal procedures—they are free to choose for themselves which purpose to pursue on any specific occasion. That LEAN may act against its other-regarding purposes is no more a bar to standing than that it acts against the self-interest of some of its own members.

\* \* \*

Section 3004(m)(1) provides, in relevant part, that

> the Administrator shall ... promulgate regulations specifying those levels or methods of treatment, if any, which substantially diminish the toxicity of the waste or substantially reduce the likelihood of migration of hazardous constituents from the waste so that short-term and long-term threats to human health and the environment are minimized.

42 U.S.C. § 6924(m)(1).

In the preamble to its new variance rule, EPA stated that in considering whether a particular variance complies with this language, it may consider "the risks posed by the continuation of any existing land disposal of the untreated waste, that is, the risks posed by leaving previously land disposed waste in place." 62 Fed.Reg. 64,-506/2 (1997). Further, in an apparent illustration of specific factors it might look to in selecting the right level for a specific variance, EPA mentioned "disposal of treatment residues in a subtitle C landfill"—that is, a landfill subject to the hazardous waste disposal controls of RCRA § 3004 et seq. *Id.* LEAN argues that both considerations are improper under the statute.

Whether EPA's words qualify as a "regulation" under RCRA's judicial review provision, 42 U.S.C. § 6976(a)(1) (providing review within 90 days of action promulgating "regulation"), depends on three factors: EPA's own characterization, whether it published the language in the Federal Register or the Code of Federal Regulations, and whether the action has binding effect on either private parties or EPA. See *Florida Power & Light Co. v. EPA*, 145 F.3d 1414, 1418 (D.C.Cir.1998). (The first two factors are, of course, the best indication of the third.) The EPA argues that this is a reviewable "regulation" and has published the contested material in the Federal Register, and we see nothing in the actual language that would indicate that it intended something less than an official, binding interpretation of the statute.

LEAN's challenge must also satisfy ripeness requirements. But as Congress has provided immediate review of RCRA regulations, see 42 U.S.C. § 6976(a)(1), we need only find that the issue is fit for judicial review. See *George E. Warren Corp. v. EPA*, 159 F.3d 616, 622 (D.C.Cir.1998) ("Where the [fitness] prong of the *Abbott Laboratories* ripeness test is met and Congress has emphatically declared a preference for immediate review ... no purpose is served by proceeding to the [hardship] prong."). Fitness for judicial review is based on "whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Id.* at 621. With respect to these first questions— whether the statute entirely bars EPA from consideration of certain factors—all three criteria indicate fitness for review and, accordingly, ripeness.

On the merits: in the words of *Chevron*, "the statute is silent or ambiguous with respect to the specific issue" of whether the "threats" to be "minimized" under § 3004(m) may include the threat

posed by leaving waste where it currently is. *Chevron v. NRDC,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). LEAN's argument here appears to be that because § 3004(m) only regulates waste to be disposed of in new landfill sites (a point that is not disputed), it follows that the only "threats" to be considered and "minimized" are threats from waste in such a new site. This appears a complete non sequitur. It seems far more natural to suppose that in a statute enacted to protect human health and the environment, Congress intended to direct EPA to keep its eye on this underlying goal, rather than to use purely artificial benchmarks for inquiring whether threats are truly "minimized." Not only does the statute not resolve the specific issue contrary to EPA's resolution, but the latter is plainly reasonable in light of the statutory language and structure.

▉ We also find that Congress has not barred EPA, in its determination whether the "minimize[ ]" language is satisfied, from considering the protective effect of eventual disposal in a subtitle C landfill. LEAN's argument to the contrary depends on our decision in *American Petroleum Institute v. EPA,* 906 F.2d 729, 735–36 (D.C.Cir.1990) ("*API*"). LEAN evidently reads this case to foreclose EPA from considering in any way the protective characteristics of the waste's place of ultimate deposit. But *API* held only that, because land disposal pursuant to § 3004(m)(2) is dependent upon compliance with the § 3004(m)(1) treatment requirement, land disposal *itself* cannot constitute the "treatment" required to satisfy § 3004(m)(1). *Id.* Thus, *API* makes clear that in measuring whether the "treatment" required will "substantially diminish" toxicity or "substantially reduce" the likelihood of migration, EPA must look to the (pre-disposal) treatment. EPA does not dispute this, even in the variance context. But as to whether EPA may look more broadly in determining if the overall *effect* is to "minimize[ ]" threats, *API* says noth-

ing. Although LEAN points to another, later rulemaking in which EPA appears to have read the mandate of *API* more broadly, see 63 Fed.Reg. 28,607/3 (1998), a possible later error is no basis for us to upset the present rule.

Nor do we find EPA's interpretation here unreasonable in light of the statute's language and structure. It would be senseless to make EPA, in attempting to protect human health and the environment, ignore the eventual disposal site's likely effect: such a restriction would deprive EPA of any basis from which to estimate the *actual* risk likely to be imposed on the outside world.

We thus reject these challenges on the merits.

\*      \*      \*

LEAN appears to make two additional challenges. It first claims that something in the present rule violates the "substantially diminish ... substantially reduce" language of § 3004(m)(1). But, apart from LEAN's claims as to what the statute categorically excludes from consideration in assessing the "minimiz[ation]" required by the section, the issue of whether a particular treatment brings about substantial diminution or reduction—although concededly a restriction on whatever treatment is approved—cannot be decided without particular challenged treatments before us. Accordingly, we find the issue unfit for judicial review at this time.

LEAN next argues that EPA's risk calculations will be unfairly compromised by its improper refusal to exercise its power to force excavations of hazardous waste. But when prompted at oral argument, counsel for petitioners was unable to point to any language indicating EPA's intention to do such a thing, and counsel for EPA denied any such intent. We see no ripe case or controversy here.

We dismiss these unripe challenges.

\*      \*      \*

We find no reason to disturb EPA's decision. We dismiss the petition in part and deny the remainder.

*So ordered.*

SENTELLE, Circuit Judge, concurring in part and dissenting in part:

I wholly concur in the portion of my colleagues' opinion and judgment that dismisses the diminution or reduction and risk calculation claims of Louisiana Environmental Action Network as unripe. As to the portion of the opinion denying the remainder of the petition, I do not disagree with their view of the merits; I simply do not think we can properly reach the merits at all. I am not at all convinced that petitioners have carried their burden of establishing that they have standing to challenge the RCRA regulations.

In order to satisfy the "essential and unchanging" standing predicate to any exercise of the jurisdiction of an Article III court, a litigant must establish the "irreducible constitutional minimum of standing," by demonstrating that it has suffered a "concrete and particularized" injury that is (1) "actual or imminent," *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), (2) caused by or fairly traceable to an action that the litigant challenges in the litigation, *see Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), and (3) redressable by the court in the action, *see Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). We require a plaintiff or petitioner to show that the injury is current, or "at least imminent" in order to avoid the possibility that the court may be "unconstitutionally render[ing] an advisory opinion by 'deciding a case in which no injury would have occurred at all.'" *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 663 (D.C.Cir.1996) (quoting *Defenders of Wildlife,* 504 U.S. at 564 n. 2, 112 S.Ct. 2130). A speculation of harm is not sufficient to demonstrate the concrete, particularized injury necessary for constitutional standing. *Simon,* 426 U.S. at 44, 96 S.Ct. 1917 ("[U]nadorned speculation will not suffice to invoke the federal judicial power.").

That the current injury is speculative is demonstrated by the very terms in which it is expressed. As the majority describes the injury, the most that LEAN has demonstrated is that three of its members live near a site "at which most waste from [Louisiana] *would be* 'land disposed' *if* excavated and treated." Maj. op. at 67 (emphasis added). The majority relies solely on the fact that there are approximately 100 sites in Louisiana for which cleanup has been found necessary as grounds for concluding that it is "all but certain that remediation activities will continue to occur apace." *Id.* at 68. From this conclusion, the majority opines that "[e]ven if the variance-to-remediation ratio is fairly low, the amount of such activities creates a very 'substantial probability' that *some* variances will be granted." *Id.* However, neither the majority, nor anyone else, can say whether the variance-to-remediation level will be high, low, or even zero. The majority correctly concludes that the record evidence indicates that there is a "substantial probability" that remediation will occur in the future at sites in Louisiana. However, it improperly leaps from this well-supported proposition to the wholly unsupported conclusion that, as part of any future remediation at sites in Louisiana, "some variances will be granted," adversely affecting the interests of the named LEAN members. Assent to this latter proposition requires a grand leap of faith since we can only speculate concerning whether EPA will grant variances for sites in Louisiana. Indeed, there is no record evidence indicating that any of the sites referenced by the majority would be suitable candidates for variances under EPA's new program, since EPA has not yet acted to grant or deny a single variance. For these reasons, I can only conclude that petitioners' alleged injury is speculative at best.

The purely speculative variety of failed standing occurs most frequently where, as here, petitioners are attacking an action of an agency or other entity which they contend is likely to encourage some third party not before the court to take some action which would be detrimental to plaintiffs and might possibly occur if that third party acts upon the encouragement. The Supreme Court has discussed this proposition in a number of decisions, including *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In *Warth,* the Court opined that in litigation challenging the governmental regulation of one party on the basis that it causes harm to a third party, "the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights. But, it may make it substantially more difficult to meet the minimum requirement of article III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions or that prospective relief will remove the harm." *Id.* at 505, 95 S.Ct. 2197. All the more difficult where, as here, it is speculative that the harm will occur at all. In *Florida Audubon Society v. Bentsen,* 94 F.3d 658 (D.C.Cir.1996), we held that plaintiffs had not demonstrated standing where they had not shown that it was substantially probable that the promulgation of the alleged incentive toward the third party would cause the speculated injury. Here there is no such showing and no standing.

In short, I would hold that plaintiffs have not demonstrated that they meet the constitutional minimum of a concrete, particularized injury or that any such injury is caused by the acts of a defendant of which they complain. Instead of denying the petition, I would dismiss it.